A09A0433. GORDON v. FLEEMAN et al.
A09A0434. GORDON v. BARNHART et al.
(680 SE2d 684)

PHIPPS, Judge.

Nathaniel Fleeman and Juhmel Barnhart died as a result of a fire at their home. The men were renting their residential spaces from Lucy Dessesseau, who had leased the real property from its owner, Irvine Gordon. Dessesseau and Gordon were sued in connection with Fleeman's death by Fleeman's father,[1] individually and as administrator of the estate. In connection with Barnhart's death, they were sued in a separate case by Barnhart's father[2] and by the administrator of that estate.[3] The two wrongful death cases were consolidated for trial, at which a jury found both defendants liable. Judgments upon the jury's verdicts were entered.

In Case No. A09A0433, Gordon appeals the judgment entered in the case concerning Fleeman's death; in Case No. A09A0434, he appeals the judgment entered in the case concerning Barnhart's

---

[13] Id. at 325.

[1] Fleeman's father is William Fleeman. Hereinafter, however, "Fleeman" refers to the decedent Nathaniel Fleeman.

[2] Barnhart's father is Gregory Barnhart. Hereinafter, however, "Barnhart" refers to the decedent Juhmel Barnhart.

[3] Jacqueline Barnhart Strickland serves as the administrator of Barnhart's estate.

death.[4] Gordon maintains in both appeals that the evidence did not authorize the jury to find him liable, and therefore, the trial court erred by denying his motions for a directed verdict and motions for a judgment n.o.v., or in the alternative, a new trial on general grounds. Because there was evidence authorizing the jury's verdicts, we affirm the judgments.

"The standard of appellate review of the denial of a motion for new trial on the general grounds is essentially the same as that applicable to the denial of a motion for directed verdict or judgment n.o.v."[5] The appellate courts can set a verdict aside, on evidentiary grounds, as being contrary to law only if "it lacks any evidence by which it could be supported."[6]

The residential structure where the fire occurred was a duplex, with each side comprised of two levels. Three tenants lived on one side of the duplex, herein denoted as side A. Several men lived in the other side of the duplex, herein denoted as side B. Fleeman, Barnhart, and a nephew of Dessesseau had bedrooms upstairs on side B, where there was also the bathroom for that side. Another man's bedroom was downstairs, where the kitchen was also located.

The fire started at about 2:00 a.m. on February 2, 2005, on side B in the kitchen. It is undisputed that firefighters arrived and found Fleeman upstairs on side B, in the bathtub; he died a few days later from complications stemming from burns sustained during the fire. It also is undisputed that firefighters found Barnhart upstairs in his bed and that he was taken to a hospital, where he was pronounced dead. His death resulted from smoke and soot inhalation.

The ensuing lawsuits sounding in negligence were premised upon allegations that Gordon had failed to install smoke detectors as required by OCGA § 25-2-40. Subsection (a) of that Code section states in pertinent part that

> every dwelling and every dwelling unit within an apartment, house, condominium, and townhouse and every motel, hotel, and dormitory which was constructed prior to July 1, 1987, shall have installed an approved battery operated smoke detector which shall be maintained in good working order.[7]

In pertinent part, subsection (b) of that Code section provides

---

[4] Dessesseau, pro se in the trial court, has not appealed either judgment.

[5] *Cook v. Huff*, 274 Ga. 186 (1) (552 SE2d 83) (2001) (citation omitted).

[6] Id. (citation and punctuation omitted); see also *Williams v. Kennedy*, 240 Ga. 163, 165-166 (4) (240 SE2d 51) (1977).

[7] OCGA § 25-2-40 (a) (2).

YALE LAW LIBRARY

further:

> In dwellings, dwelling units, and other facilities listed in subsection (a) of this Code section, a smoke detector shall be mounted on the ceiling or wall at a point centrally located in the corridor or area giving access to each group of rooms used for sleeping purposes. Where the dwelling or dwelling unit contains more than one story, detectors are required on each story including cellars and basements, but not including uninhabitable attics.

To support their allegations at the September 2007 trial, the plaintiffs presented testimony by the defendants Gordon and Dessesseau, as well as the fire investigator who had been assigned to the case. Gordon testified that the duplex was constructed in the late 1940s or early 1950s, that he purchased it in 1998, and that he leased it to Dessesseau in April 2004. When he leased the duplex to Dessesseau, Gordon testified, he was aware of her plan to use the property to provide housing to individuals who were mentally or physically infirm. Gordon recalled that Dessesseau and a house contractor, who had worked on numerous of his other rental properties, had walked through the duplex and made a list of what needed to be repaired. Gordon claimed that he had delegated to them the authority and responsibility to "fix it to her specifications." Regarding smoke detectors, Gordon could attest only that "they were supposed to be installed." He conceded that he had never personally installed any smoke detector, never purchased any smoke detector, and never walked through the property to confirm that smoke detectors were installed by the contractor. Thus, he had no personal knowledge that any smoke detector had ever been installed anywhere on side B of the duplex.

Dessesseau testified that, in leasing the property from Gordon, she had no conversation with him about smoke detectors. Furthermore, she did not inspect the duplex for smoke detectors, did not notice any smoke detectors on side B of the duplex, had not been told by anyone that any smoke detector was installed on that side of the duplex, and did not install a smoke detector after leasing the property. Regarding the tenants on side B, Dessesseau described the men paying for residential spaces as disabled, but "high functional." Her nephew who also lived on side B was not a paying tenant, but "helped out a little bit," for example, by "ensuring appropriate behavior."

The fire investigator called by the plaintiffs had served as the lead investigator at the fire scene. He arrived at the duplex at about 3:00 on the morning in question, after the fire had been extinguished

by firefighters. He found side A not affected by the fire, except for having a smoke odor. The upstairs level of side B had sustained "heavy smoke" damage, but "very little heat damage." The downstairs level of side B, however, had sustained "fire damage." The investigator determined that the fire had started as a result of food or grease that had been left unattended on the stove.

The fire investigator testified further that, as part of his routine duties when responding to fire calls, he searches the property at issue for the presence of smoke detectors. The investigator searched both sides of the duplex for installed smoke detectors. On side A, he found a nonoperational smoke detector lying on the floor in the upstairs hallway. On side B, the investigator found neither a smoke detector nor a "backing plate," which he explained is a mount for a smoke detector, typically attached with screws to the walls or ceilings of the building.

The fire investigator testified that a main purpose of a smoke detector is to awaken people when there is a fire. Over objection, he explained that products of combustion, such as carbon monoxide, can put a sleeping person in a deeper state of sleep such that he or she will not awaken as easily.[8] Moreover, he continued, even if a person does awaken, it is not uncommon for the person to be disoriented due to the shock of the fire itself. The fire investigator thus stated that a purpose of a smoke detector is "to wake you up earlier so you could have time to escape the home."

. In his defense, Gordon called the contractor to whom he had delegated responsibility to "fix" the duplex, one of the tenants of side A, and the forensic toxicologist who had analyzed fluids from Barnhart's body. And Gordon again took the stand, this time introducing in evidence his lease agreement with Dessesseau covering the date of the fire.

The contractor had worked on various of Gordon's rental properties since 1990. With respect to the duplex, he testified, "I fixed everything that need[ed] fixing in the house. That's what I did. I went in there and remodeled the house." He specifically recalled that Gordon had purchased the required smoke detectors, then told him: "Put them on both sides." He testified that, accordingly, he installed the smoke detectors on both sides — upstairs and in the kitchens.

Dessesseau's nephew had lived in side B since Dessesseau began leasing the property. He testified that he had never seen a smoke detector upstairs, but that a smoke detector had been installed on a

---

[8] The physician who conducted the autopsy upon Barnhart's body also testified that exposure to carbon monoxide could cause an individual to lose consciousness.

kitchen wall. Prior to the date of the fire, he further testified, he had taken that smoke detector off the wall and put it in the pantry because it "kept going off."

Dessesseau's nephew also gave an account of the night of the fire. The other residents of side B were all asleep by 11:30. After falling asleep, he was awakened by the odor of smoke and screams of someone outside the duplex. He opened his bedroom door and saw flames coming up the stairway; smoke had filled the upstairs area. Fleeman, whose bedroom was across the hall from his, was in the hallway. Dessesseau's nephew told Fleeman not to go down the steps, but to follow him; the nephew then jumped out his bedroom window to save himself. He explained that he had not been able to reach Barnhart's bedroom because it was too close to the steps.

The tenant from side A, who was also called by Gordon as a witness, had spent a lot of time on side B. Since the fire, he had maintained close relationships with Dessesseau and her nephew. The tenant recalled seeing several installed smoke detectors on side A and one smoke detector installed in the kitchen on side B, but he believed that residents occasionally would take them down. This tenant further testified that Fleeman and Barnhart had engaged in smoking crack cocaine, but did not know how frequently.

A forensic toxicologist testified as an expert to having found cocaine metabolites in a blood sample taken from Barnhart's body. She described a cocaine metabolite as an "inactive" substance that "has no effect on the body, the brain or the body such as, . . . other drugs, cocaine. . . . It doesn't affect anything. Its presen[ce] simply tell[s] you that someone has at some point metabolized cocaine." She clarified, "At the time of death, [Barnhart] didn't have any cocaine present [in his body]." She further testified that Barnhart did not have any other illegal drug in his system that would have affected his response at the time of the fire.

1. In Case Nos. A09A0433 and A09A0434, Gordon contends that the evidence did not authorize a finding that he had breached any duty under OCGA § 25-2-40, citing, inter alia, his contractor's testimony that smoke detectors were installed in side B, upstairs and in the kitchen. Moreover, Gordon points out that subsection (g) of OCGA § 25-2-40 provides, "Failure to *maintain* a smoke detector in good working order in a dwelling, dwelling unit, or other facility . . . shall not be considered evidence of negligence [and] shall not be considered by the court on any question of liability of any person."[9] Gordon also cites language in OCGA § 44-7-14 that "[h]aving fully parted with possession and the right of possession, the landlord is

---

[9] (Emphasis supplied.)

not responsible to third persons for damages resulting from the negligence or illegal use of the premises by the tenant." Thus, Gordon argues that under the cited provisions, once a landlord installs a smoke detector in a dwelling or dwelling unit, the landlord has discharged his statutory duty and cannot be liable for negligence.

But the testimony cited by Gordon did not mandate a finding that he had installed smoke detectors as required under OCGA § 25-2-40. It merely created evidentiary conflicts with other testimony that allowed for a contrary finding. That testimony included that of: the fire investigator, who found neither a smoke detector nor a backing plate installed on side B; Dessesseau's nephew, who lived on side B and could recall only one smoke detector, which was downstairs; and the tenant from side A, who regularly visited side B and could recall only one smoke detector, which was downstairs.[10] "This court does not pass upon the credibility of witnesses, nor the weight to be given evidence on disputed facts."[11] Assessing the credibility of witnesses and weighing the evidence are functions for the jury.[12] The jury was not required to believe the testimony relied upon by Gordon, and other testimony authorized the jury's finding that Gordon had breached statutory duties pertaining to the installation of smoke detectors. Under these circumstances, nothing in the language Gordon cites from either OCGA § 25-2-40 or § 44-7-14 insulated him from liability.

2. In Case No. A09A0433, Gordon contends that there was no evidence linking his failure to duly install smoke detectors with Fleeman's death, and thus, causation required for negligence liability was not established. Gordon relies on evidence that Fleeman was awake during the fire and was alerted of the danger, pointing to the testimony of Dessesseau's nephew that Fleeman was in the hallway during the fire and that he told Fleeman not to go downstairs, but to follow him.

Consistent with the fire investigator's testimony regarding smoke detectors, this court has recognized, "The purpose of a smoke detector is to provide an early warning of fire and to reduce the damages and injury resulting therefrom."[13] The evidence did not demand a jury finding that an earlier alarm to the residents would not have lessened or eliminated Fleeman's exposure to the flame. Rather, the evidence authorized the jury to find that the fatal injuries Fleeman sustained in the fire were caused by Gordon's

---

[10] See OCGA § 25-2-40 (a) (2), (b).

[11] *Williams*, supra at 165 (citation and punctuation omitted).

[12] *St. Paul Mercury Ins. Co. v. Meeks*, 270 Ga. 136, 138 (1) (508 SE2d 646) (1998).

[13] *Housing Auth. of the City of Atlanta v. Jefferson*, 223 Ga. App. 60, 62 (2) (476 SE2d 831) (1996) (full concurrence in Division 2).

failure to comply with OCGA § 25-2-40.[14]

3. In Case No. A09A0434, Gordon contends that there was no evidence linking his failure to install smoke detectors with Barnhart's death, and thus the required causation element was not established. He cites evidence that around the time of the fire, Barnhart had been prescribed various medications, which if taken collectively, would have rendered him unable to focus. In addition, Gordon cites evidence that these prescribed medications, along with cocaine — which Barnhart was shown to have consumed at some time — would have produced unpredictable effects upon Barnhart.

The evidence concerning Barnhart's prescribed medications, their effects if taken collectively, and their effects when consumed together with cocaine was not introduced during the liability phase of the trial. It was introduced during the damages portion of the trial, which began after the jury returned its verdict as to liability. The jury could not have been bound by evidence that had not yet been presented. Furthermore, during the liability phase of the trial, the expert forensic toxicologist testified that, at the relevant time, Barnhart had in his system neither cocaine nor any other illegal drug that would have affected his response at the time of the fire.

Finally, Gordon asserts that the evidence showed that Barnhart never woke up, despite the screaming outside the duplex and "commotion" inside the residence during the fire. Nevertheless, the evidence did not demand a jury finding that an earlier alarm to the residents of the danger would not have eliminated or reduced Barnhart's exposure to the smoke and soot. Rather, the evidence authorized the jury's finding that Barnhart's fatal inhalation of smoke and soot was caused by Gordon's failure to comply with OCGA § 25-2-40.[15]

*Judgments affirmed. Smith, P. J., and Bernes, J., concur.*

DECIDED JULY 1, 2009.

*Lawson & Thornton, George O. Lawson, Jr., Thomas, Kennedy, Sampson & Patterson, Thomas G. Sampson*, for appellant.
*Watkins, Lourie & Roll, Stephen R. Chance*, for Fleeman.

---

[14] See id.; see generally *Williams*, supra at 163 (1) (questions of negligence, diligence, contributory negligence and proximate cause are peculiarly matters for the jury, and a court should not take the place of the jury in solving them, except in plain and indisputable cases).

[15] See *Housing Auth. of the City of Atlanta*, supra; see also *Williams*, supra.